# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**LAWRANCE D. MAHOMES**                                          **PLAINTIFF**
*ADC #152147*

**v.**                          **No: 4:23-cv-00547-JM-PSH**

**SHANE WEST,** *et al.*                                          **DEFENDANTS**

## PROPOSED FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following Recommendation has been sent to United States District Judge James M. Moody, Jr. You may file written objections to all or part of this Recommendation.  If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## DISPOSITION

### I.  Introduction

Plaintiff Lawrance D. Mahomes filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, while incarcerated at the Conway County Detention Center (the "CCDC")

(Doc. No. 2).[1]  The Court subsequently granted Mahomes' application to proceed *in forma pauperis* (Doc. No. 3).  After Mahomes filed multiple amended complaints and addenda, the Court ordered service of his amended complaint (Doc. No. 26) and addenda (Doc. Nos. 25, 27-28) on medical provider Darrell Elkin ("Elkin") and Jail Administrator Shane West and Sheriff Mike Smith (the "County Defendants").[2]  *See* Doc. No. 29.  Mahomes alleged that he did not receive adequate medical treatment for "a broken left hand, broken right shoulder, spinal, hips, neck and back injuries" at the CCDC after he was incarcerated there on May 7, 2023.  Doc. No. 26 at 4-5.  He further alleged he was forced to sleep on the floor for weeks, causing him "excruciating and agonizing pain," and that he did not receive mental health

---

[1] Mahomes is currently incarcerated at the Arkansas Division of Correction's Grimes Unit.  *See* Doc. No. 158.

[2] Mahomes initiated this lawsuit on June 13, 2023, naming the Conway County Detention Center as the only defendant and generally alleging that he had been denied adequate medical care and had been forced to sleep on the floor.  Doc. No. 2 at 4.  At the Court's direction, Mahomes amended his complaint on June 20 (Doc. No. 4), and then again on July 7 (Doc. Nos. 8-9).  The Court initially recommended dismissal of Mahomes' claims because he did not describe sufficient facts to support his conclusory claims.  *See* Doc. No. 10.  Mahomes objected to the Court's recommendation and filed another amended complaint and an addendum (Doc. Nos. 13-15).  United States District Judge James M. Moody, Jr. declined to adopt the Court's recommendation, finding that Mahomes had described additional facts warranting a re-screening.  *See* Doc. No. 16.  Mahomes filed additional amended complaints and addenda on August 1 (Doc. No. 18), August 10 (Doc. Nos. 19-20), and August 16 (Doc. No. 23).  The Court then gave Mahomes one final opportunity to file a superseding amended complaint on August 28, 2023 (Doc. No. 24). Mahomes subsequently filed his operative amended complaint on September 7, 2023 (Doc. No. 26), and addenda (Doc. Nos. 25, 27-28).

treatment.[3]  *Id.* at 7.

Before the Court are motions for summary judgment and related pleadings filed by Mahomes and the defendants (Doc. Nos. 131-133, 136-142, & 147-151). For the reasons described below, Mahomes' motion should be DENIED, and the defendants' motions should be GRANTED.

## II.  Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986).  When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party.  *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002).  The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial.  *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007).  The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy.  *Id.* (citations

---

[3] Although some evidence was submitted regarding Mahomes' other complaints, such as his diet or issues related to his wool blanket, those are not described in his operative complaint and are therefore not relevant to this case.  Mahomes also confirmed that he is not suing based on a lack of medication while at the CCDC.  *Doc. No. 139-2, Mahomes' Deposition Testimony,* at 43:14-18.

omitted).  An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .".  Fed. R. Civ. P. 56(c)(1)(A).  A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012).  Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment.  *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

### III.  Facts[4]

### *Mahomes' Arrest & Incarceration*

On May 6, 2023, Mahomes was arrested by Morrilton Police and charged with First Degree Battery, a Class B felony.  Doc. No. 139-1.  Following the arrest, while

---

[4] These facts were taken from the evidence provided by the parties.  Opinions, legal conclusions, and immaterial facts are omitted.

being transported to the CCDC for booking, Mahomes advised the transporting officer that he needed to go to the emergency room.  Doc. No. 139-2, *Mahomes' Deposition Testimony* ("*Mahomes Deposition*"), at 20-21, 25-33. Mahomes was taken to the St. Vincent Emergency Room to receive medical attention for complaints of left hand and shoulder pain. *Id.;* Doc. No. 139-3.  Mahomes was then booked into the CCDC as a pre-trial detainee on May 7, 2023, and released to the Arkansas Department of Corrections on February 16, 2024.  Doc. No. 138 at ¶ 1; Doc. No. 141 at ¶¶ 5, 45.

As previously discussed, Mahomes filed his operative amended complaint and addenda between September 7 and 14, 2023, and agrees that the relevant time period for his claims is May 7 – September 7, 2023.  *See Mahomes Deposition* at 41.  All dates referenced in these facts occurred in the year 2023, unless otherwise noted.

### *Defendants' Involvement with Mahomes' Medical Treatment at the CCDC*

Detainees and prisoners of the CCDC are directed to submit any nonmedical requests, medical calls, and all grievances using a kiosk that is available to them 24 hours a day, seven days a week.  Doc. No. 139-4, *Declaration of Shane West* ("*West Declaration*"), at ¶ 11.  County Defendant Shane West is employed as the Jail Administrator for the CCDC.  *Id.* at ¶ 3.  As Jail Administrator, West and other CCDC officers review and address nonmedical requests, medical calls, and grievances submitted by detainees and prisoners of the CCDC.  *Id.* at ¶ 13.  West

and other CCDC officers forward all medical calls and any other requests recognized as medical in nature to medical staff by placing detainees and inmates on the "doctor's list." *Id.* at ¶ 14. *See also* Doc. No. 137-1, *Affidavit of Darrell Elkin* (*"Elkin Affidavit"*), at ¶ 6 (explaining that the jail administrator places any medical requests concerning medical care into the medical care provider's box at the jail).

According to his declaration, West does not provide medical treatment to detainees. *West Declaration* at ¶ 4. He is not a physician and cannot prescribe medical care or treatment. *Id.* at ¶ 5. West must rely upon the expertise of medical providers to diagnose and treat inmate medical conditions. *Id.* at ¶ 6. He is not consulted by medical personnel in determining whether or not an inmate needs medical treatment. *Id.* at ¶ 7. West does not supervise Defendant Darrell Elkin or any other medical staff at the CCDC. *Id.* at ¶ 8. West has never prevented or interfered with any medical treatment pertaining to Mahomes. *Id.* at ¶ 10. *See also Mahomes Deposition* at 36:16-19.

County Defendant Mike Smith is the Conway County Sheriff. Doc. No. 139-5, *Declaration of Mike Smith* ("*Smith Declaration*"), at ¶ 3. Smith does not provide medical treatment to detainees. *Id.* at ¶ 4. He is not a physician and cannot prescribe medical care or treatment, and he is not consulted by medical personnel in determining whether an inmate needs medical treatment. *Id.* at ¶¶ 5-6. Smith does not supervise Elkin or any other medical staff at the CCDC. *Id.* at ¶ 8. He has never

prevented or interfered with any medical treatment pertaining to Mahomes. *Id.* at ¶ 10. *See also Mahomes Deposition* at 36:16-19. Smith was not involved in the processing of nonmedical requests, medical calls, or any grievances during Mahomes' incarceration at the CCDC. *Smith Declaration* at ¶ 11.

Mahomes testified in his deposition that neither Smith nor West prevented him from receiving medical care and treatment while he was in the custody of CCDC. *Mahomes Deposition* at 36:16-19. He further testified that he never talked to Smith in person, but claimed he sent "plenty of requests and letters that staff would take the letters and say they placed them in the Sheriff's box." *Id.* at 37:2-4. *See also id.* at 52:11-14, 18-25; 53:1-2; 58:9-25; 59:1-6. Mahomes stated that he informed Smith of the medical issues he was having but has no copies of these letters. *Id.* at 37:5-23. He further explained that he made Smith and West aware that he needed medical care and was dealing with excruciating pain, but they did not address those issues. *Id.* at 81:9-25.

Defendant Darrell Elkin is an advanced healthcare practitioner who is contracted to provide medical services to inmates in Conway County. *Elkin Affidavit* at ¶ 2. According to Elkin, he visited the CCDC once or twice a week, retrieved the medical requests from his box, and would begin seeing inmates. *Id.* at ¶ 7. Elkin explained that he would interview and examine each inmate to form a diagnosis and order any treatment necessary according to the standard of care for their medical

issues. *Id.*

### *Mahomes' Medical Treatment Prior to Incarceration at CCDC*

In his affidavit, Elkin references Mahomes' medical records prior to his May 7 incarceration at the CCDC. *Elkin Affidavit* at ¶¶ 10-12. He noted that Mahomes was evaluated at the CHI St. Vincent ER on February 5, 2023, for left hip pain and left shoulder pain. *Id.* at ¶ 10; Doc. No. 137-1. The records indicated "No fracture, subluxation or dislocation, with no follow-up appointment(s) ordered, except follow-up with primary care provider as needed." *Id.*

Elkin further noted that Mahomes was a patient at the Little Rock Rehab Institute and Extended Care on April 17-25, 2023, for a psychiatric evaluation and symptoms of depression. *Elkin Affidavit* at ¶ 11; Doc. No. 137-2. While there, Mahomes also reported pain in his right shoulder related to a prior fall. Doc. No. 137-2 at 7-8. On April 17, Mahomes had an orthopedic consult for his right shoulder complaints. *Id.* at 17. The physician's plan stated that his "right shoulder chronic dislocation will likely need operative reduction x 2 months out." *Id.* The physician stated his right arm would be placed in a sling and Mahomes should follow-up in one or two weeks to schedule surgery. *Id.* The record is silent regarding whether Mahomes followed up to schedule a surgery.

After his arrest on May 7, Mahomes was taken to CHI St. Vincent's Emergency Room (ER) for evaluation of finger pain on his left hand and right

shoulder pain. *Elkin Affidavit* at ¶ 12; Doc. No. 137-4 at 1. He was diagnosed with a fractured finger – his left hand showed a fracture of the distal shaft of the fifth metacarpal, boxer's facture. Doc. No. 137-4 at 3, 12. An ulnar gutter splint was applied to his left hand and no follow-up appointment ordered, other than to follow-up with an orthopedic specialist. *Id.* at 3. Elkin's chronic problems with his right shoulder were also noted. *Id.* at 3, 13. According to his radiology results and notes, Mahomes' right shoulder showed significant joint deterioration, and a history of humeral head fracture approximately six months earlier was noted along with prior treatment for right shoulder dislocation with reduction. *Id.* at 3. Mahomes' shoulder X-ray found "severe degenerative change at the right glenohumeral joint," "poor definition of the glenoid," and "anterior dislocation of the humeral head." *Id*. at 13. Further, an underlying fracture could not be "completely excluded." *Id.* Mahomes was not given any medication prescriptions at the ER. *Mahomes Deposition* at 51: 9-11.

### Mahomes' Relevant Grievances, Requests & Relevant Medical Treatment at the CCDC

On May 8, Mahomes was involved in an altercation with another inmate and was to be placed in isolation after stating that he was going to hang himself. *Elkin Affidavit* at ¶ 13; Doc. No. 137-5, *Incident Report*. Mahomes was given a risk assessment by Arisa Health Emergency Services the same day. *Elkin Affidavit* at ¶ 13; Doc. No. 137-6. It was recommended that Mahomes be put on suicide watch

with safety protocols until he could meet with the jail doctor for medication management of symptoms. *Id.*

That same day, Elkin visited with Mahomes as a follow-up from his May 7 ER visit. *Elkin Affidavit* at ¶ 14. His left wrist was splinted; he stated to Elkin that he was good and had no new signs, symptoms, or concerns since his ER visit. He was continued on his current regimen. *Id. See also* Doc. No. 137-7.

On May 9, Mahomes was evaluated by Counseling Associates. *Elkin Affidavit* at ¶ 15; Doc. No. 137-8. The record reflects that Mahomes reported:

> I had some problems with my wife and we got into it and I got arrested. Client reported that he is currently on suicide watch. Client noted when he came to the CCDC, he had been drinking and was suicidal. Client arrived to CCDC on Sunday. Client reports connection with his attorney today. Client feels he is "doing okay." Client noted they had a long visit. Client does not report any suicidal or homicidal ideation.

Doc. No. 137-8 at 3. The mental health professional recommended that Mahomes be removed from suicide watch and connected with the staff physician, and that he connect with any officer if any suicidal/homicidal thought arose. *Id.* at 8.

Eleven days after his arrest, on May 17, Mahomes submitted a request form, stating that he slept on the floor the previous night and requesting that he be assigned a bottom bunk rather than a top bunk due to his injuries. Doc. No. 139-6 at CCDC 000049-000050.[5] The same day, Mahomes submitted a grievance stating he was

---

[5] For ease of reference, page numbers for this exhibit refer to the Bates numbers stamped on the bottom of each page.

sleeping on the floor which was making his injuries worse.  *Id.* at CCDC 000048-000049.  He requested that he be provided a "bottom bed or release on monitor." *Id.* Within 24 hours, West responded that he would look into the issue.  *Id.* at CCDC 000048-000050. Mahomes never submitted another request form requesting a bottom bunk.[6]  *Id.*; *see also* Doc. No. 150 (Mahomes' response describing his grievances and requests).  Mahomes never submitted a medical call seeking a medical restriction for a bottom bunk.  *Id.*  No medical restriction for a bottom bunk was ever communicated to West by any medical provider. *West Declaration* at ¶ 17. Mahomes testified that he paid an inmate for a bunk with commissary to get off the floor.  *Mahomes Deposition* at 48:10-12.

On May 26, Mahomes filed two requests and a grievance asking to be transported to the Veterans Hospital for treatment of his "physical and psychological medical conditions" and "for shoulder surgery, broken left hand and injuries to spine."  Doc. No. 139-6 at CCDC 000174-000175, 000177-000178.  He was added to the doctor's list the same day.  *Id.*

Elkin evaluated Mahomes the following day, May 27.  *Elkin Affidavit* at ¶ 16. Elkin submitted an order for an appointment to be made with an orthopedist for Mahomes' left hand and renewed Mahomes' prescriptions for ibuprofen for his

---

[6] On June 10, Mahomes filed a request for an extra mat due to spinal injuries.  Doc. No. 139-6 at CCDC 000032.  West responded on June 12, "that would be a question for medical." *Id.*

shoulder pain and an antifungal for his fingers. *Id.*; Doc. No. 137-10. According to Elkin, Mahomes stated that he had no other concerns. *Elkin Affidavit* at ¶ 16.

Elkin next saw Mahomes again on June 24. Doc. No. 137-11. Between his May 27 and June 24 visits, Mahomes submitted at least one medical call, five requests, and more than 20 grievances regarding his medical care.[7] *See* Doc. No. 139-6 at CCDC 000022-000037, 000039-000045, 000165-000173. West or other jail staff responded to nearly each grievance or request, noting that Mahomes was on the list to see the doctor or that his concerns were being addressed. *Id.* West also responded to several by asking Mahomes if he had spoken to medical about these issues and by noting that Mahomes had been seen at the ER before he came to jail. *Id.* at CCDC 000022-000023, 000028, 000030, 000032, 000172-000173.

At Elkin's visit with Mahomes on June 24, Elkin ordered his pharmacy records from the VA and asked the assistant jail administrator to review his prior records for any special diet that he had received during his last incarceration in the CCDC.[8] *Elkin Affidavit* at ¶ 17; Doc. No. 137-11.

Mahomes submitted a medical request on June 24, presumably after his visit

---

[7] Doc. No. 139-6, the exhibit containing these documents, is difficult to follow, not in chronological order, and contains numerous requests and grievances unrelated to this case. This makes it difficult to count the exact number of requests and grievances filed by Mahomes regarding the issues in this complaint.

[8] On June 27, Mahomes filed another request for a list of his medications from the VA pharmacy. Doc. No. 139-6 at CCDC 000161-000162. C. Wilson responded that the VA pharmacy was working on faxing over the paperwork. *Id.*

with Elkin, stating he had received inadequate and ineffective medical care by the jail doctor and requested to be taken to the emergency room immediately.  Doc. No. 137-13; Doc. No. 139-6 at CCDC 000164.  He also stated, "I've been rendered almost totally bedridden as a result of denial of or ineffective medical care!"  *Id.*

Between June 23 and June 26, Mahomes submitted several more grievances and requests complaining about the delay in his receiving medical care.  Doc. No. 139-6 at CCDC 000017–000021, 000162-000164.  West responded each time, informing Mahomes that he had an appointment scheduled with a specialist.  *Id.*  He was also added to the doctor's list on June 30.  *Id.* at CCDC 000163.  During this same time frame, Mahomes submitted a request to talk to mental health, due to his mental anguish at being denied health care.  *Id.* at CCDC 000020.  He also submitted a request asking to speak to Smith about the denial and delay of his medical care. *Id.* at CCDC 000019–000020. In his declaration, Smith stated that he never received any correspondence from Mahomes related to his medical care, but if he had, he would have forwarded it to West to forward to the medical staff.  Doc. No. 139-5 at ¶ 12.

On June 28, a CCDC officer transported Mahomes to Conway Orthopedics & Sports Medicine Center where he was seen by orthopedic specialist, Dr. James Howell.  *Elkin Affidavit* at ¶ 18; Doc. No. 137-12.  His complaints regarding his left hand and both shoulders were noted and X-rays were taken.  Doc. No. 137-12 at 1-

3.  His left shoulder X-ray showed no arthritis, normal alignment, normal soft tissue, and a well maintained subacromial space. *Id.* at 3.  Mahomes' right shoulder X-ray showed "dislocated right glenohumeral joint with suture anchors in place." *Id.* These results were discussed with him, and Mahomes was told to remove his hand splint and work on gentle range of motion.  *Id.*  He received a steroid injection in his left shoulder that day.  *Id.* at 4.  Dr. Howell noted, "[a]s he is incarcerated, will address right shoulder when he is out of jail.  He would like to follow up with VA for surgery. RTC PCN." *Id.*  Dr. Howell provided no orders indicating that Mahomes was in immediate need of surgery.

Elkin saw Mahomes again on June 30.  Doc. No. 137-13.  In the two days between seeing the orthopedic surgeon and seeing Elkin, Mahomes requested an OR, claiming he needed surgery ASAP.  Doc. No. 139-6 at CCDC 000125.  He also filed a request seeking medical care for "remaining health issues that have not been addressed, shoulders, back, spine, hips and neck." *Id.* at CCDC 000160.

At the June 30 visit, Elkin reviewed Mahomes' list of medications previously ordered by the VA, and noted that Mahomes had not taken any of those medications since April of 2023.  Doc. No. 137-13; *Elkin Affidavit* at ¶ 20.  Elkin resumed Mahomes' medications that were most pertinent to his presentation, signs, symptoms, and history. *Id.*

Mahomes filed a grievance the same day, claiming that the doctor was

"insulting, combative and hurled racist insults" at him.  Doc. No. 139-6 at CCDC 000124.  He requested a different doctor and stated that the doctor was aware of the lawsuit he had filed.  *Id.*  The next day, July 1, Mahomes requested a new medical provider.  *Id.* at CCDC 000159.

Elkin saw Mahomes next on July 8.  Doc. No. 137-14.  Between visits on June 30 and July 8, Mahomes submitted a request to see a specialist for "spine, neck, back, hips and shoulders" due to "extreme chronic pain."  Doc. No. 139-6 at 000158.  He was added to the doctor's list the same day.  *Id.*  When Elkin saw him for this complaint on July 8, he noted no limitations on exam, stating that Mahomes ambulated without any concern and there was no evidence of discoloration or edema.  Doc. No. 137-14; *Elkin Affidavit* at ¶ 21.

Elkins next saw Mahomes July 28.  Doc. No. 137-15.  Between July 8 and July 28, Mahomes again requested a specialist for his shoulders, hand, spine, hips and neck again.  Doc. No. 139-6 at CCDC 000157.  He was added to the doctor's list.  *Id.*  And when Elkin examined him on July 28, he noted that Mahomes ambulated in his cell, and had no limitations, edema, sensory deficits or discoloration.  Doc. No. 137-15.  In his affidavit, Elkin noted that Mahomes had not reported any new injuries, accidents or trauma since his ER and orthopedic visits.  *Elkin Affidavit* at ¶ 22.

Prior to Elkins' next visit with Mahomes on August 16, Mahomes filed several

requests and/or grievances concerning his spine, hips, shoulders or hands.[9]  Doc. No. 137-16 at 1; Doc. No. 139-6 at CCDC 000150-000154, 000014.  In response to one of those requests, Mahomes was added to the doctor's list on August 7.  Doc. No. 139-6 at CCDC 000151, 000154.  However, on August 8, the jail nurse noted that she witnessed Mahomes ambulating unassisted and without difficulty as he was meeting with his visitors.  Doc. No. 137-16 at 1.  She further noted he had full range of motion (ROM).  *Id.*

On August 14, Mahomes submitted a request to see mental health, stating that he was having mental issues.  Doc. No. 137-17; Doc. No. 139-6 at CCDC 000146-000147.  Elkin spoke with Mahomes on August 16 about his mental state; he noted that Mahomes was very calm and cooperative, complained of generalized abdominal pain, and denied having fever, decreased appetite, diarrhea or constipation.  *Elkin Affidavit* at ¶ 24.

Elkins did not see Mahomes again between August 16 and September 7, the date Mahomes filed his operative amended complaint.  During this time period, Mahomes submitted several medical calls, grievances, and requests regarding pain and/or his mental health.  *See* Doc. No. 139-6 at 000139-000140; Doc. No. 137-19

---

[9] Mahomes also filed several other requests during this time period.  *See* Doc. No. 139-6 at CCDC 000013 (August 12 request for an "OR" for "shoulder and stomach surgery ASAP!"); *id.* at CCDC 000145 (August 15 request to see a doctor right away or go to the emergency room due to a swollen stomach and severe pain); and *id.* at CCDC 000144 (August 17 request to be transported to the VA hospital for treatment).

at 1 (August 26 medical call requesting a roller walker, arm crutches, and a back brace); Doc. No. 139-6 at CCDC 000135 (September 2 request asking to resume mental and physical therapy at the VA); *Id.* at CCDC 000007 (September 4 request claiming his right shoulder was dislocated and asking to see a specialist); *id.* at CCDC 000134 (September 7 grievance regarding mental health care). Mahomes was added to the doctor's list on September 8. *Id.* at CCDC 000134-000135.

### Treatment After Operative Amended Complaint Filed[10]

On September 12, Mahomes received a disciplinary for various rule violations, including hoarding his medications and refusing to take them. Doc. No. 137-20. He was placed in Administrative Isolation. *Id.* According to Elkin, the medications that he was refusing were placed on hold. *Elkin Affidavit* at ¶ 27.

On September 20, Elkin attempted to visit with Mahomes who was still in Administrative Isolation, but Mahomes told Elkin that he no concerns and refused to be seen. *Elkin Affidavit* at ¶ 28; Doc. No. 137-21. Over the next few weeks, Mahomes filed several more medical requests, some requesting mental health treatment, and was evaluated by Elkin. *Elkin Affidavit* at ¶¶ 29-33; Doc. No. 137-22 (request submitted for mental health treatment but complained only of sinus issues); Doc. No. 137-23 (request for mental health treatment but no issues upon

---

[10] Although not relevant to Mahomes' claims in this case, these facts are included for additional context.

examination; additional records requested from VA); Doc. No. 137-24 (request for psychiatric treatment submitted and request for sleep medications made at visit); Doc. No. 137-25 (request for antibiotic eye drops submitted; shoulder pain noted at visit); Doc. No. 137-26 (request for dental treatment).

Mahomes submitted a request complaining of shoulder, neck, hip, spine, back and hand pain on November 10. Doc. No. 137-27. At his November 15 visit with Elkin, there were no limitations noted, and no new accidents or trauma since his ortho and ER visits. *Id.*; *Elkin Affidavit* at ¶ 34. He had full range of motion of all extremities, and there were no sensory or vascular abnormalities noted. *Id.*

On December 2, a nurse wrote an incident report stating that Mahomes had hoarded his medication, and it was taken away. Doc. No. 137-28. The next day, he refused his medications. Doc. No. 137-29. On December 6, Mahomes met with Elkin to discuss taking his medications and was told he would be placed in medical observation to be sure he had no adverse reactions to taking his medications as prescribed. *Elkin Affidavit* at ¶ 37; Doc. No. 137-30. According to Elkin, Mahomes became angry and threatened to hit Elkin and a guard with an iPad. *Elkin Affidavit* at ¶ 38. After being placed back in medical observation, Mahomes threatened to kill himself and was placed on suicide watch per jail protocol. *Id.* at ¶ 39. He was moved back to population a few days later after indicating he was no longer suicidal and signed "no harm to self" documents. *Id.* at ¶ 39.

Elkin's last visit with Mahomes was on December 10, in which he stated that he was eating well and that he had no further ideations of self-harm. *Elkin Affidavit* at ¶ 41; Doc. No. 137-31. He was cooperative, answered Elkin's inquiries appropriately, stated he had no new concerns, and was continued on his current regimen. *Id.*

Mahomes was released to the Arkansas Department of Corrections on February 16, 2024. He testified he received a right shoulder replacement surgery on October 17, 2024. *Mahomes Deposition* at 65:1-10.

### IV. Analysis

### A. *Mahomes' Motion*

Mahomes filed a motion for summary judgment and a brief in support (Doc. Nos. 131-132). Mahomes did not file a separate statement of facts as required by Local Rule 56.1, Rules of the United States District Court for the Eastern District of Arkansas. He includes a list of facts in his motion for summary judgment under the title "Declaration in Support of Motion for Summary Judgment." Doc. No. 131 at 1. However, to the extent these facts could be construed as a separate statement of facts, they are wholly conclusory and do not establish that Mahomes is entitled to summary judgment. Rather, Mahomes simply states that his jail records (181 pages) support a finding that the defendants were deliberately indifferent to his medical needs and violated his rights to due process.

Additionally, Mahomes' motion should be denied because it is unsupported. As plaintiff, Mahomes bears the burden of proof. However, the only evidence he refers to in his motion are his jail records which were later submitted by the County Defendants (Doc. No. 39-6 at CCDC 000001-000181). These records show that Mahomes made *many* complaints about his medical treatment; they do not show, for the reasons explained below, that any defendant was deliberately indifferent to Mahomes' serious medical needs. Mahomes' motion should therefore be DENIED.

## B.   *Defendant Elkin's Motion*

A prisoner's denial of medical care claim is analyzed under the Eighth Amendment, whether that prisoner is a pre-trial detainee or a convicted inmate.[11] To succeed with an Eighth Amendment inadequate medical care claim, Mahomes must allege and prove that: (1) he had objectively serious medical needs; and (2) prison officials subjectively knew of, but deliberately disregarded, those serious medical needs. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). Additionally, the Eighth Circuit has held that a "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise

---

[11] Pretrial detainees' claims are evaluated under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment. *See Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004). However, pretrial detainees are entitled to at least as much protection under the Fourteenth Amendment as under the Eighth Amendment. *See Morris v. Cradduck*, 954 F.3d 1055, 1058 (8th Cir. 2020) (applying deliberate indifference standard to pretrial detainee's claims of inadequate medical care).

to the level of a constitutional violation." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).

Viewing the evidence in the light most favorable to Mahomes, the Court finds that the undisputed material evidence in the record does not establish that Elkin was deliberately indifferent to Mahomes' serious medical needs. Rather, the record shows that either Elkin or a nurse addressed Mahomes' various complaints, including his complaints about his various injuries and his mental health concerns.

Between May 7, the day Mahomes was booked into the CCDC, and September 7, the date his operative amended complaint was filed, Elkin saw Mahomes a total of seven times (and Mahomes was placed on the doctor's list again on September 8 for another visit). Specifically, Elkin followed up with Mahomes on May 8 after he was booked into the CCDC; at that time, Mahomes reported he had no new signs, symptoms or concerns following his May 7 ER exam. Doc. No. 137-7. Mahomes did not submit a request seeking medical treatment until May 26, and Elkin saw him on May 27, at which time he referred Mahomes to an orthopedist and renewed his prescription for ibuprofen (Mahomes testified he did not take the ibuprofen due to an allergy). *See Facts, supra;* Doc. No. 137-10. Elkin then saw Mahomes again on June 24, and Mahomes was evaluated by Dr. Howell on June 28. Doc. Nos. 137-11 – 137-12. Dr. Howell advised him to work on range of motion with his hand, gave him a steroid injection in his left shoulder, and concluded that

his right shoulder could be addressed when he was released from jail. Doc. No. 137-12.

Mahomes saw Elkin again on June 30 to review his medications, and again on July 8 and July 28, based on Mahomes' complaints of extreme pain in his spine, neck, back, hips, and shoulders. Doc. Nos. 137-13 – 137-15. Elkin noted at both July visits that Mahomes ambulated without concern and had no limitations. *Id.* A nurse also noted Mahomes' ability to ambulate and full range of motion on August 8. Doc. No. 137-16. Elkin spoke with Mahomes about his mental health on August 16 after Mahomes reported mental health issues. Doc. No. 137-17.

In his deposition testimony, Mahomes made clear that he disagreed with Elkin's course of treatment and believed he should have been referred to another doctor or specialist. *Mahomes Deposition* at 78. Mahomes believed Elkin should have taken additional X-rays or looked for another reason he experienced pain even after Dr. Howell examined him on June 28 and stated his right shoulder could be addressed after his release from jail. Mahomes was immediately dissatisfied and continued to file grievances and requests until he filed his operative complaint approximately two months later. *See Facts, supra.* Mahomes' mere disagreement with Elkin's treatment does not equate a constitutional violation. *See Estate of Rosenberg by Rosenberg*, 56 F.3d at 37.

Because the evidence in this record does not establish that Elkin was

deliberately indifferent to Mahomes' serious medical needs, his claims against them in both their individual and official capacities[12] should be dismissed with prejudice.

## C.     County Defendants' Motion

### 1.     Official Capacity Claims.

Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veach v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010).  Thus, a suit against a defendant in his official capacity is in essence a suit against the County or city itself.  *See Murray v. Lene*, 595 F.3d 868 (8th Cir. 2010); *Liebe v. Norton*, 157 F.3d 574 (8th Cir. 1998).  A municipality cannot be held liable on the basis of *respondeat superior*, or simply by virtue of being the employer of a tortfeasor.  *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201 (8th Cir. 2013).  Accordingly, West and Smith, as county employees, can only be held liable in their official capacity in this case if Mahomes can establish that a constitutional violation was committed pursuant to "an official custom, policy, or practice of the governmental entity."  *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009).  Mahomes did not allege in his complaint that his failure to receive medical treatment at the CCDC was caused by an unconstitutional policy or custom of Conway County.  West and Smith are therefore entitled to judgment as a matter

---

[12] *See Brockinton v. City of Sherwood*, 503 F.3d 667, 674 (8th Cir. 2007) (official capacity claim fails if plaintiff cannot establish a constitutional violation).

of law in their official capacities.

    2.    <u>Individual Capacity Claims</u>.

The County Defendants argue that they are entitled to qualified immunity with respect to Mahomes' claims against them in their individual capacities because he cannot establish that they were deliberately indifferent to his serious medical needs.[13]  Doc. No. 140 at 14-15.

Viewing the evidence in the light most favorable to Mahomes, the Court finds that the undisputed material evidence in the record does not establish West and Smith were deliberately indifferent to Mahomes' serious medical needs.  Most importantly, Smith and West were not responsible for, and did not provide, medical treatment to Mahomes.  The lack of involvement by the County Defendants precludes liability on their parts.  *See Mayorga v. Missouri,* 442 F.3d 1128, 1132 (8th Cir. 2006) ("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.") (internal quotations and citations omitted).

Furthermore, Mahomes acknowledged that he never talked to Smith, but believed he was made aware of his complaints (or should have known of them).

---

[13] To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015).  Qualified immunity is a question of law, not fact, for the court to decide. *Kelsay v. Ernest*, 933 F.3d 975, 981 (8th Cir. 2019).

*Mahomes Deposition* at 36-37, 58-59.  And while West personally reviewed and responded to most, if not all, of Mahomes' grievances and requests, he repeatedly placed Mahomes on the list to see the doctor and advised him to place a medical call. There is no indication that Mahomes' requests and grievances were ignored or disregarded.[14]

For these reasons, West and Smith are entitled to summary judgment.

### V.  Conclusion

The undisputed facts establish as a matter of law that the defendants were not deliberately indifferent to Mahomes' serious medical needs. The undersigned therefore recommends that Mahomes' motion for summary judgment (Doc. No. 131) be DENIED; that the defendants' motions for summary judgment (Doc. Nos. 136 & 139) be GRANTED; and that Mahomes' claims be DISMISSED WITH PREJUDICE.

DATED this 23rd day of February, 2026.

_____
UNITED STATES MAGISTRATE JUDGE

---

[14] To the extent West did not respond to each and every request filed, that was reasonable given the duplicative nature of the many repeated requests filed by Mahomes.